```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

          v.                        13 Cr. 894 (RWS)

MATTHEW SOUCHET,
                                    Sentence
              Defendant.

------------------------------x
                                    New York, N.Y.
                                    October 30, 2014
                                    4:00 p.m.
Before:

        HON. ROBERT W. SWEET

                                    District Judge




          APPEARANCES


PREET BHARARA
     United States Attorney for the
     Southern District of New York
SAMSON A. ENZER
     Assistant United States Attorney


FEDERAL DEFENDERS OF NEW YORK, INC.
     Attorneys for Defendant
BY:  CHRISTOPHER A. FLOOD
     Assistant United States Attorney
```

1           (Case called)

2           THE CLERK:  Government, are you ready?

3           MR. ENZER:  Good afternoon, your Honor.  Samson Enzer
4    for the government.

5           THE CLERK:  Defendant, are you ready?

6           MR. FLOOD:  Yes, your Honor.  Good afternoon.
7    Christopher Flood, Federal Defenders of New York, on behalf of
8    Mr. Souchet, who is present at counsel table.

9           THE COURT:  Thank you.  Mr. Flood, have you had an
10   opportunity to review the pre-sentence report with your client
11   and the Court's sentencing opinion?

12          MR. FLOOD:  Yes, I have, your Honor.

13          THE COURT:  Is there anything you would like to tell
14   me, sir?

15          MR. FLOOD:  Yes, sir, there is.  I understand from
16   speaking with your deputy this morning that the Court received
17   our letter, so I will attempt not to belabor the points I made
18   therein.  But there are a few things I want to bring to the
19   Court's attention that I don't think we did put in our letter,
20   and a few points in the letter I think are inescapable.

21          First off, it doesn't back away from Mr. Souchet's
22   acceptance of responsibility to say that this incident and his
23   possession of the gun in this case comes in the context of a
24   very complicated and difficult life that he has led.  The
25   Court's imposition of its sentence today, regardless of the

1  number that the Court imposes, will be the most severe sentence
2  he has ever received, and it will definitely have a major
3  impact on his life.
4          I can say that confidently because I know that the
5  time that Mr. Souchet has served in incarceration thus far has
6  already had a major impact on the way he thinks about himself
7  as a member of our society, as a member of his family, and as a
8  parent.
9          He has been incarcerated now for a little more than 13
10 months if you add up the amount of time he has been in federal
11 custody, and I think it is about a little more than 4 weeks
12 that he was in state custody before he was brought over to
13 federal custody.  That's the longest he has ever been away from
14 his family, in the custody of anybody.  That has actually been
15 a rather severe sanction.
16         Even though the government goes rather
17 enthusiastically in its letter for a high level of
18 incarceration here, ultimately any incarceration that imposes a
19 very significant human cost.  I had the opportunity to witness
20 that human cost a couple of weeks ago when the Court allowed
21 Mr. Souchet to attend his grandmother's funeral.  On behalf of
22 the family, I want to take this opportunity to thank the Court
23 for that display of confidence in Mr. Souchet and in the
24 Court's mercy and good judgment.  The Court put Mr. Souchet in
25 my custody, and I accompanied Mr. Souchet to that funeral.

1          I observed something during the hours that I was there
2    which I think really does bear on the decision today.  As I sat
3    in the back of that room up in East Harlem where the family had
4    gathered to pay their final respects to the matriarch of his
5    familiarly -- and many of them are gathered here today, as the
6    Court can see in the courtroom -- first of all, I watched Mr.
7    Souchet paying his respects to his family members and saw him
8    rejoin is 5-year-old daughter, who is a very remarkable young
9    girl.

10          I could see the effect of seeing her with her father
11   there, the joy she brought, the simplicity of having her father
12   in the room, the humbleness that Mr. Souchet had to be amongst
13   that group of people.  I saw the human cost of incarceration
14   from a different angle that counsel isn't often able to see.

15          It occurred to me that the Court's wisdom in allowing
16   that to happen, I wish I could have thought to bring a video
17   camera to show it to the Court, to say thank you, I'm glad the
18   Court was able to let this happen and let the Court see that it
19   was allowing this to happen.

20          What struck me most was the cab ride back to the MCC,
21   which is the hardest part, I think, of those several hours.
22   That's when Mr. Souchet had to leave that all behind and step
23   back into jail for what he expects to be not just a few weeks.
24   The Court is going to be imposing a sentence today that we
25   don't expect to be time served.  He knows he has to walk back

1    into the prison sentence and turn his back on that warm moment.

2           His reflections in that cab ride were, I did this
3    myself, I'm glad the judge took a chance on me, and I hope you
4    can explain this to my daughter, but I'm never going to go back
5    to what that life was that got me here in the first place, I
6    have something to live for now.  That is the voice and the
7    insight of a young man who is trying to turn his life around.
8    He is young enough to do that.

9           The government in its letter talks about a criminal
10   career.  I don't think that is a fair reflection of what Mr.
11   Souchet's criminal background shows.  Yes, he has a predicate
12   felony.  Yes, it is for a couple of firearms.  He was very
13   young when that took place.

14          He was coming back from living in Virginia, not just
15   Virginia but Roanoke, western Virginia.  The culture there with
16   firearms is different.  He paid a price for that.  He should
17   not have possessed the firearms then.  The circumstances of the
18   firearms now are severe.  We understand that.

19          But his criminal history in between then and now,
20   largely misdemeanors, like drug possession cases, trespass from
21   what appears to be a sweep of his building or nearby from what
22   I can tell, it is not what I would think fairly called out as a
23   criminal career, number one.  Secondly, he is young enough to
24   turn his life around.

25          Thirdly, the guideline range that is set forth in the

1  PSR here, which I am going to address in a moment, is low
2  enough that he is going to be out at a time, regardless of what
3  sentence the Court imposes -- even if the Court were -- we
4  would beg the Court not to do this -- to maximize his sentence,
5  he is going to be out and a productive citizen at some point in
6  his life.
7        The point is he's going to be out as a member of this
8  community at some point.  He believes in himself, that he can
9  do something more than what he has done in the past.  His
10 family believes he can do that.
11       I have collected, because he has provided them for me,
12 a total of 10 certificates from the time that he has been at
13 the MCC, taking the time that he has been incarcerated trying
14 to better himself.  I can pass these up to the Court if the
15 Court is interested or would like to review them, but I can
16 summarize here.
17       He has been studying American history, geography,
18 religion, biology.  He took a 40-hour drug abuse prevention
19 course even though he really doesn't have much of a drug
20 problem of any kind.  He tock the time to study that because,
21 frankly, it is in his family and in his community.  It is good
22 for him to have those tools available.
23       He has taken courses on self-education, Coach John
24 Wooden's Pyramid of Success, the coach from UCLA basketball.
25 And Getting Out by Going In, which is kind of like a

1   self-reflection course of study with two levels.  He's taken
2   both levels.
3           This is hours of self-reflection and study he has done
4   at the MCC.  It is taking the time to make the most of his
5   incarceration, to take seriously the penitentiary, if you
6   would, to take that time on self-reflection to try and turn his
7   life around.
8           He knows he has done wrong.  He is trying to take this
9   moment in his life seriously so that he doesn't slide back.
10  I've seen from it my perspective.  I believe he is trying to
11  improve himself.  The Court took a chance on him a couple of
12  weeks ago.  He humbly is grateful for that.
13          If I could make a couple of more points.  While he was
14  at the MCC, he got rather poor medical treatment for a hand
15  injury which occurred during his arrest, which included a bone
16  sticking out of his hand.  I have his medical record here.  So
17  his time there has been rather painful.  We ask the Court to
18  take that into consideration.  It has been a very difficult
19  time at the MCC for over a year.
20          Number two, there are 36 days by our count that will
21  not be credited towards his federal sentence unless this Court
22  credits that time of state incarceration towards his federal
23  sentence, because the Bureau of Prisons will not give him
24  credit for that state incarceration prior to him being brought
25  over here.

1            Also, by the pre-sentence report and the government's

2   calculation of the guidelines, we did not plead subject to a

3   plea agreement with the government.

4            There are two points for obstruction of justice given

5   to Mr. Souchet here because of him fleeing from the police and

6   creating a risk of endangerment for throwing the gun down while

7   running.  It was a loaded gun, he did throw it down, that is

8   accurate.

9            That happens all the time.  That happens in many, many

10  felon in possession cases.  It is exceptionally rare to see a

11  2-point enhancement for that kind of conduct.  That 2 points

12  is, of course, driving us up to the range that we are seeing

13  now of 37 to 46.

14           We don't believe that that is necessary to single Mr.

15  Souchet out.  The fact of the matter is the guidelines in this

16  case are because of his criminal history.  They are just not

17  that high.  The state elected not to prosecute him.  They still

18  can if they want to.  If the government believes his conduct

19  for what he was doing that night that he was arrested deserves

20  the kind of punishment that they really want, the state should

21  prosecute him for that.

22           We would ask for lower than 37 months.  We think the 2

23  points is unnecessary here.  We would ask the Court for a

24  period of less than 37 month of incarceration.

25           THE COURT:  Thank you, sir.

1    MR. FLOOD:  Thank you.

2    THE COURT:  Mr. Souchet, anything you want to tell me
3    in addition to what's been stated so ably on your behalf by Mr.
4    Flood?

5    THE DEFENDANT:  I'd like to thank you.

6    THE COURT:  We have these microphones here, but they
7    are not connected.  There may be some symbolism in that.  I'm
8    not sure what it is.  Yes.

9    THE DEFENDANT:  I would like to thank you for letting
10   me be able to attend my grandmother's services.  I know she
11   would only want what is best for me, and that's me changing my
12   life around.  It hurt me that she can't be here today.

13   I understand a lot of people don't get the chance that
14   I have gotten.  But me being incarcerated also did show me a
15   lot about family and the loved ones that I'm hurting.  There is
16   one particular person that I'm hurting the most, and that's my
17   daughter, Scarlette Souchet.  She is 5 years old.  She deserves
18   to have me, her father, in her life.  I know because of my
19   actions I can't be there at the moment.

20   I know her and my family, they are also paying for my
21   actions, because even though I'm in here doing time, they are
22   doing time with me.  I'd like to say I'm truly sorry for my
23   actions and what it brung me to.

24   THE COURT:  Thank you, sir.

25   Anything from the government?

1     MR. ENZER:  Yes, your Honor.  Most of what I have to
2  say is in the government's submission.  I don't want to repeat
3  what is in there, but I want to hit a few points.
4     This is not an ordinary felon in possession case.
5  This is an extraordinary case.  It is a case where somebody
6  didn't just possess a gun, they fired it recklessly in a
7  crowded neighborhood.  The defendant did that.  And when he did
8  that, he endangered lives.  There could have been other
9  funerals to attend if any of those bullets had struck someone.
10     There is clearly a disagreement between the parties
11  about the sentence that is appropriate here, but there is a lot
12  that is not in dispute.  There is no dispute that in 2007 the
13  defendant was arrested with two guns and was convicted, and he
14  was given a fairly lenient sentence.  He was sentenced to 90
15  days and 5 years of probation.  That was a second chance.  He
16  violated his probation and was sentenced to a year.  According
17  to the defense submission, and we don't dispute it, he served
18  less than a year from that.
19     That should have been a wakeup call.  That should have
20  been enough to prevent him from reoffending.  But he did
21  reoffend.  In this case, about a year ago, at the end of
22  September in 2013, he was on a street in a neighborhood that is
23  densely populated.  He had a gun.  He wasn't allowed to have a
24  gun.
25     He didn't just hold it or passively possess it.  He

1  fired it multiple times, round after round.  Two of those

2  bullets pierced into an apartment where an elderly couple lives

3  with two children.  Those facts are not in dispute.  Those two

4  bullets could have hit the grandparents, could have hit the

5  children.  It is by the grace of God that they didn't.

6        There was an officer on the street nearby who saw the

7  defendant firing the rounds.  He ducked for cover.  That's

8  noted in the Court's opinion.  He could have been hit by one of

9  those bullets.  It is by the grace of God that he wasn't.

10        The defendant ran away.  Other police officers chased

11  him.  While they were chasing him, he dropped the gun on the

12  ground to try to get rid of the evidence and ran away.  There

13  was a bullet loaded in the chamber.  That bullet could have hit

14  either of the officers chasing him.  It is by the grace of God

15  that they didn't get hit.

16        That is in addition to the fact that of the total

17  bullets he fired off, approximately 11 rounds were recovered.

18  That means he fired the gun 11 times, approximately, and the

19  one bullet in the chamber could have killed somebody.  That is

20  12 possible lives that could have been taken.

21        In a case like this, a bottom of the guidelines

22  sentence is not appropriate.  It is not enough to reflect the

23  seriousness of the misconduct.  It is not enough to deter this

24  defendant or others like him, and it is not enough to provide

25  just punishment.

          The government is not unsympathetic to the family circumstances that the defendant has cited, to the statements he makes about trying to make progress and to the statements he makes about his daughter.  His daughter was alive, she would have been about 4 years old, at the time when he fired those 11 rounds.  That didn't stop him from doing it.  Nor did the prior sentence he had gotten in a felony case.  Those things were not enough.

          A sentence at the high end of the guidelines range is necessary to stop him and teach him a lesson and prevent others like him from doing this again and to protect the community.  It would send the wrong message to the elderly couple, to the young children in their apartment, to the police officer who ducked, to the two policemen who chased after the defendant when he dropped that gun with a bullet loaded in the chamber, it would send the wrong message to those people to give this defendant a sentence at the bottom of the guidelines.

          Mr. Flood has raised a point about the two-level enhancement for reckless endangerment during flight.  I'm not sure whether his argument is that it does not apply as a matter of law or that he is simply asking under 3553(a) for below-guidelines sentence.

          To the extent he is saying this guidelines enhancement doesn't apply, that argument was never raised in an objection to either the draft pre-sentence report, the final version, the

1   Court's opinion, or the defense sentencing submission, and it

2   is wrong anyway.  That enhancement applies because the facts

3   demonstrate that the defendant, while fleeing from police,

4   threw a weapon that wasn't just loaded.  It had a bullet in the

5   chamber.  If anything had touched that trigger, that bullet

6   could have gone off and hit one of those police officers.

7           There is case law from several circuits where throwing

8   a loaded gun in a crowded neighborhood and leaving it there

9   where somebody could find it, that alone in those cases was

10  enough to trigger that enhancement.  So it does apply under the

11  law.  And to the extent it doesn't, any objection to it has

12  been waived.

13          For these reasons, your Honor, the government submits

14  that a sentence at the high end of the range is what is

15  appropriate here.

16          THE COURT:  Anything further, Mr. Flood?

17          MR. FLOOD:  I dispute that we have waived any

18  objection, your Honor.  And I stand on my previous argument.  I

19  think the government is perfectly aware that this 2-point

20  enhancement is never applied in this district for people

21  throwing guns.  It just isn't applied.  This is like the random

22  case where it is.

23          I think the reason it is is because the government

24  asked probation to apply it, and the reason the government

25  asked probation to apply it is to try and push the guidelines

1   up because the guidelines in Mr. Souchet's case aren't really

2   all that high because his prior isn't a crime of violence;

3   therefore, they don't get that big an enhancement because of

4   the nature of federal firearms guidelines.  That's just the

5   nature of the federal firearms guidelines.  So that's just

6   where we are.

7            I don't believe we have waived it.  Frankly, to single

8   Mr. Souchet out -- by the way, Mr. Enzer overstates the

9   government's case, saying there is no dispute about the source

10  of shots going through walls and stuff like that.  We don't

11  know what happened out there that night, the defense doesn't.

12           In terms of firing and stuff like that, that is not

13  the source of the 2-point enhancement about the gunshots going

14  off.  It's about the gun being thrown to the ground.  That is

15  the source of the 2-point enhancement, and that is absolutely

16  prosaic.  The Court has seen many cases, felon in possession

17  cases, where the gun is being dropped to the ground, people

18  being tackled.  This 2-point enhancement for obstruction of

19  justice, it's like lightning striking.

20           That's all.

21           THE COURT:  Mr. Souchet, every sentence is a difficult

22  one.  This is particularly difficult because I believe that

23  what your counsel has told me is accurate.  I mean by that I

24  think you have learned, and by what he has told me, I think you

25  have recognized that you have to turn your life around and

1  overcome the difficulties with which you were faced as a young
2  man and assume an adult's responsible life for your daughter
3  and to help your family.  I think you have realized that.
4         On the other hand, for whatever reason, why it
5  occurred I don't know, but there could be little less
6  responsible act than spraying the landscape with bullets.
7         I also credit to a degree your counsel's suggestion as
8  to what the usual practice in this district is, and I also
9  would like to give you credit for the time you have served in
10 state custody.
11        But I understand the government's desire to send a
12 message.  I have heard this before.  I would like to believe
13 that these messages, when sent, are received.  I'm not sure
14 that they ever are.  I think the irresponsibility of your
15 conduct on the day that you were arrested means that you should
16 not have a sentence at the bottom of the guidelines, but I do
17 want to give you credit for the time you have served.  I am
18 going to lean in your direction because of the 2-point
19 enhancement.
20        The sentence will be as set forth in the sentencing
21 opinion except the term of imprisonment will be 42 months, not
22 37.
23        You have a right to appeal this sentence, to be
24 represented free of charge on that appeal if you don't have
25 funds.

1    I presided over a trial of a young man about your age
2 who was involved with guns and became a hired killer.  You'd
3 better be careful and you'd better be sure that this change
4 that you tell me about is real.  If not, this could only be the
5 beginning of a disaster.  I hope it will be the beginning of a
6 useful life on the other end.  So I wish you good luck.
7    Is there anything further?
8    MR. ENZER:  Not from the government.
9    MR. FLOOD:  I do have a few small requests, your
10 Honor, housekeeping.  One, we ask that the Court recommend to
11 the BOP that Mr. Souchet be designated to a facility close to
12 the New York area.
13    THE COURT:  I will do that.
14    MR. FLOOD:  Secondly, we ask the Court to strike from
15 the PSR paragraphs 40 through 42, which is just other arrests,
16 unsubstantiated conduct.  In particular, working backwards, 42,
17 there is an aggravated harassment with some detail in the
18 allegation which then says is not processed.  That is basically
19 nothing more than probable cause.  This document, the PSR, is
20 going to follow Mr. Souchet around with the imprimatur of
21 accuracy.  This has not been found by any court, so we ask that
22 it be stricken.
23    THE COURT:  What is the government's position with
24 respect to 42?
25    MR. ENZER:  The probation department routinely puts a

1  defendant's entire criminal history, whether it is convicted or
2  acquitted conduct.  There is no reason to strike it.  While
3  this incident may not have resulted in conviction, that doesn't
4  mean it didn't happen.  Future courts should be aware of it.
5          MR. FLOOD:  That is not the purpose of the
6  pre-sentence report.  As the government is well aware, future
7  courts, future probation departments, can pull criminal records
8  just as ably as our probation department can.
9          THE COURT:  The last line, I don't know what it really
10 means, but there is the possibility that the decision was made
11 to drop the case and not proceed with it, for whatever reason.
12 I will strike it.
13         MR. FLOOD:  That is 42.  41 suggests there is no
14 record of the case, which is entirely ambiguous, which is
15 jumping a turnstile to avoid payment of the fare.
16         THE COURT:  I will leave that.
17         MR. FLOOD:  Then, for disorderly conduct in the
18 Western District of Virginia --
19         THE COURT:  I'll leave that.
20         MR. FLOOD:  That exhausts my notes.  Thank you, your
21 Honor.
22         THE COURT:  Thank you all.
23         (Adjourned)
24
25